120 F.3d 1045
 97 Cal. Daily Op. Serv. 6113, 97 Cal. Daily
Op. Serv. 6333,
97 Cal. Daily Op. Serv. 6442,
97 Cal. Daily Op. Serv. 6548,
97 Cal. Daily Op. Serv. 6627,
97 Daily Journal D.A.R. 10,204,
97 Daily Journal D.A.R. 10,529,
97 Daily Journal D.A.R. 10,802,
97 Daily Journal D.A.R. 10,973
Thomas Martin THOMPSON, Petitioner-Appellant-Cross-Appellee,
v.
Arthur CALDERON, Warden of the California State Prison at
San Quentin, Respondent-Appellee-Cross-Appellant.
 Nos. 95-99014, 95-99015.
 United States Court of Appeals,
Ninth Circuit.
 En Banc Rehearing Aug. 1, 1997.
Decided Aug. 3, 1997.
Amended Aug. 8, 1997.
Second Amendment Aug. 12, 1997.
Third Amendment Aug. 20, 1997.
 
 Cynthia Holcomb Hall, Circuit Judge, issued dissenting opinion in which T.G. Nelson and Kleinfeld, Circuit Judges joined.
 Kozinski, Circuit Judge, issued dissenting opinion in which T.G. Nelson, Circuit Judge, joined.
 Kleinfeld, Circuit Judge, issued dissenting opinion in which T.G. Nelson, Circuit Judge, joined.
 Gregory A. Long, Sheppard, Mullin, Richter & Hampton, Los Angeles, California, and Quin Denvir, Sacramento, California for Petitioner-Appellant-Cross-Appellee.
 Holly D. Wilkens, Deputy Attorney General, San Diego, California, for Respondent-Appellee-Cross-Appellant.
 Appeal from the United States District Court for the Central District of California; Richard A. Gadbois, District Judge, Presiding. D.C. No. CV-89-3630-RG.
 Before: HUG, Chief Judge, BROWNING, FLETCHER, PREGERSON, REINHARDT, HALL, KOZINSKI, T. G. NELSON, KLEINFELD, TASHIMA, and THOMAS, Circuit Judges.
 FLETCHER, Circuit Judge.
 CHIEF JUDGE HUG, JUDGE PREGERSON, JUDGE REINHARDT concurring; JUDGE BROWNING, JUDGE TASHIMA, JUDGE THOMAS concurring in parts I, II and IV, and in the judgment.
 Thomas Martin Thompson's execution is scheduled for August 5, 1997, for the rape and murder of Ginger Fleischli. We recall the mandate that issued on the March 6, 1997, amended opinion in Thompson v. Calderon, 109 F.3d 1358 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 2426, 138 L.Ed.2d 188 (1997), grant Thompson's petition for a writ of habeas corpus in part, remand in part, and direct that the order scheduling his execution for August 5, 1997, be vacated.
 
 
 1
 On March 29, 1995, the district court granted in part Thompson's first federal habeas petition. It found that Thompson's trial counsel provided constitutionally deficient representation in failing to refute the rape evidence and in failing to impeach the testimony of a notoriously unreliable jailhouse informant. The district court ordered that Thompson receive a new trial on the rape conviction and the rape special circumstance finding and vacated his death sentence.
 
 
 2
 The panel reversed the district court's grant of habeas relief. It concluded that although trial counsel may have been ineffective, any deficient performance did not prejudice Thompson's defense to the rape and rape special circumstance charges. It affirmed the district court's denial of relief on Thompson's other claims, including his claim of prosecutorial misconduct. Due to procedural misunderstandings within our court, no en banc call was made. The United States Supreme Court denied Thompson's petition for a writ of certiorari, and on June 11, 1997, our court's mandate issued.
 
 
 3
 On July 22, 1997, Thompson filed an emergency motion with this court requesting that the panel recall its mandate and reconsider its decision.[1] The panel denied the motion. A majority of the active, nonrecused judges of this circuit then voted to reconsider en banc whether to recall the mandate. Because of the exceptional circumstances surrounding our handling of the appeal from Thompson's first habeas petition and because we are convinced that the panel committed fundamental errors of law that would result in manifest injustice, we now sua sponte recall the mandate and reverse the panel's decision. We affirm the part of the district court order granting Thompson's writ with respect to the rape conviction and rape special circumstance charge, and vacating his death sentence. We remand for further review with respect to the first-degree murder conviction, and vacate the State's order of execution.
 
 I. MOTION TO RECALL THE MANDATE
 A.
 
 4
 We have the power to recall the mandate of a final decision of our court, and to do so sua sponte. See Malik v. Brown, 65 F.3d 148, 149 (9th Cir.1995). We have long recognized the power to recall the mandate as a means of protecting the integrity of our processes and decisions. Perkins v. Standard Oil Co., 487 F.2d 672, 674 (9th Cir.1973). The decision whether to recall the mandate "is entirely discretionary with this court," Feldman v. Henman, 815 F.2d 1318, 1322 (9th Cir.1987), and the Supreme Court will review that decision, if at all, only for an abuse of discretion. See Hawaii Housing Auth. v. Midkiff, 463 U.S. 1323, 1324, 104 S.Ct. 7, 8, 77 L.Ed.2d 1426 (1983) (Rehnquist, J., in chambers).
 
 
 5
 Recalling a mandate is an extraordinary remedy and we will exercise our authority to do so only in exceptional circumstances, such as when it is necessary in order to prevent injustice. Zipfel v. Halliburton Co., 861 F.2d 565, 567-68 (9th Cir.1988). We have not defined or limited the exceptional circumstances that may warrant recalling the mandate. We have recalled the mandate most frequently when an intervening statutory change or Supreme Court decision has undermined the basis of our decision. See, e.g., Malik, 65 F.3d at 149 (statute); United States v. Davis, 36 F.3d 1424, 1429-30 (9th Cir.1994) (Supreme Court decision); Bryant v. Ford Motor Co., 886 F.2d 1526, 1529-30 (9th Cir.1989) (statute); Zipfel, 861 F.2d at 567-68 (Supreme Court decision). Exceptional circumstances warranting recall of the mandate also exist when recall is necessary to prevent an erroneous ruling from working an injustice. See Nevius v. Sumner, 105 F.3d 453, 461 (9th Cir.1996).
 
 B.
 
 6
 Our interest both in protecting the integrity of our processes and in preventing injustice are implicated in the case before us. The circumstances here are exceptional for a number of reasons, individually and collectively. First, our normal en banc process did not function in the intended manner. But for procedural misunderstandings by some judges of this court, an en banc call would have been made and voted upon at the ordinary time. Second, in reversing the district court, the panel appears to have made fundamental errors of law that, if not corrected, would lead to a miscarriage of justice. The consequence of our failure to act would be the execution of a person as to whom a grave question exists whether he is innocent of the death-qualifying offense, the alleged rape, and whose conviction on the first-degree murder charge may be fundamentally flawed. This is a person who has never before been convicted of a crime. Under these circumstances, we have an obligation to recall the mandate in order to preserve the integrity of the judicial process.
 
 
 7
 We must make it clear at the outset that we act to review the panel's decision not because of any new evidence offered by Thompson nor because of any new argument or ground for relief he suggests; nor do we act because Thompson presents any second or successive claim for relief. Although, in the interests of comity, we delayed acting until Thompson's state court proceedings had concluded, we act now because we have sua sponte concluded that the interests of justice require us to afford Thompson the en banc process we should have initiated immediately after the panel's decision.
 
 
 8
 Our normal procedure when we, as a court, believe a three-judge panel has erred, is to call for a vote on whether to rehear the case en banc. No active judge requested an en banc vote when the panel's initial opinion was filed in September 1996. However, when the panel filed its amended opinion on March 6, 1997, two judges of this court advised the panel that they wished to call for an en banc vote. A series of misunderstandings led those judges to believe that the time for an en banc vote had passed, and that they were prohibited from making an en banc call at that time.[2]
 
 
 9
 Because of misunderstandings or errors by members of the court, no en banc vote was taken when it ordinarily would have occurred. Instead, the panel stayed issuance of its mandate while Thompson sought a writ of certiorari from the Supreme Court, and upon denial of his certiorari petition, the mandate issued. A sua sponte request to consider en banc whether to recall the mandate was made shortly thereafter, even before the mandate was spread in the district court. Through a consultative process, the court decided to postpone action on whether sua sponte to recall the mandate until after Thompson concluded his state court habeas proceedings and filed a further request for review in this court.[3]
 
 
 10
 Among the most important and consistent themes in ... death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The [Supreme] Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.
 
 
 11
 Thompson v. Oklahoma, 487 U.S. 815, 856, 108 S.Ct. 2687, 2710, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring). We now provide for the first time en banc review of Thompson's first habeas petition--a review which became available to him only a brief period ago. The review we now provide Thompson is available to every habeas petitioner on his first petition upon majority vote of this court. It is a part of the full and fair procedure our court affords in connection with initial habeas petitions.
 
 
 12
 We reiterate that Thompson is not responsible for the lateness of the hour. When we recognized our own procedural error with respect to this first habeas petition, we did not act immediately, but determined, in the interests of comity, to wait until the state court proceedings were concluded and Thompson sought to return to federal court. Thompson returned at the earliest possible time, and we then initiated en banc rehearing on his first habeas petition. Thus neither the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244(a) & (b) ("AEDPA"), nor McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), is implicated here. Judge Hall's suggestion that we are opening the floodgates to frivolous last-minute petitions is clearly in error. We are acting not upon the basis of Thompson's petition, but upon the basis of our sua sponte determination to remedy our own errors. AEDPA and McCleskey are aimed at abusive efforts by petitioners to file second or successive petitions, not at a court's sua sponte determination that it must act to "prevent injustice [and] to protect the integrity of its process." Bryant, 886 F.2d at 1529.
 
 
 13
 We may not use our recall power " 'simply as a device for granting late rehearing.' " Moran v. McDaniel, 80 F.3d 1261, 1267 (9th Cir.1996) (quoting Johnson v. Bechtel Assocs., 801 F.2d 412, 416 (D.C.Cir.1986)). But that is not what happened here. The failure to call for en banc at the regular time in a capital case involving serious constitutional issues is in itself exceptional in our court. In fact, it is unprecedented. Indeed, there has been no occasion in the past several decades in which this court has made a similar error in any type of case. Yet our mistake should not prevent a capital habeas petitioner from receiving full and fair consideration of his claims by an en banc court, particularly in a case in which it appears that the panel decision may result in a miscarriage of justice.
 
 
 14
 The district court granted Thompson partial habeas relief on the ground that his counsel was unconstitutionally ineffective and that the ineffective assistance prejudiced the outcome of Thompson's trial. The panel reversed. An erroneous reversal alone may not be exceptional. But here, Thompson's trial counsel's ineffectiveness, as found by the district court, directly affects the issue of Thompson's possible innocence of the rape, and raises the question whether, but for the ineffectiveness, the jury would have acquitted Thompson of the rape charge and special circumstance upon which his death sentence is predicated.
 
 
 15
 The district court, after an extensive evidentiary hearing, considered Thompson's habeas petition for a prolonged period before rendering a decision granting partial relief. Its thorough and well-reasoned opinion discussed in detail trial counsel's failure to present an effective defense against the State's charge that Thompson raped Fleischli, or even to question whether a rape occurred. The district court found that trial counsel provided an ineffective defense to the State's forensic evidence of rape and that counsel's deficient performance in that respect prejudiced the verdict. See Strickland v. Washington, 466 U.S. 668, 693-94, 104 S.Ct. 2052, 2067-68, 80 L.Ed.2d 674 (1984). The district court also determined that Thompson's counsel was ineffective in failing to investigate the backgrounds of two jailhouse informants who testified that Thompson confessed to the rape, and in failing to present readily available evidence undermining the informants' testimony. The district court concluded that "the evidence of rape was not substantial" and that the failure to impeach at least one informant also prejudiced the verdict.
 
 
 16
 The panel reversed, relying primarily on the prejudice prong of the Strickland test. It concluded that counsel's assumed incompetence in failing to rebut the State's forensic evidence and to investigate and impeach witnesses whose history gravely undermines the reliability of their testimony did not affect the outcome of Thompson's trial. It reached this conclusion although the district court had explained carefully and persuasively, on the basis of its credibility determinations and assessment of the physical evidence, why the result probably would have been different with respect to the rape charge and the rape special circumstance finding. Moreover, both areas of ineffectiveness relate to the alleged rape, and Thompson's death sentence rests exclusively upon the existence of the rape conviction and the rape circumstance. At the very least, questions of the most serious nature exist as to the panel's reversal of the district court's finding that counsel's ineffectiveness raised a reasonable probability that the jury convicted Thompson of a rape he did not commit and then erroneously sentenced him to die for a capital offense.
 
 
 17
 In addition, a serious question exists as to whether Thompson was deprived of due process of law by the prosecutor's presentation of flagrantly inconsistent theories, facts, and arguments to the two juries that separately heard Thompson's case and that of his co-defendant, David Leitch. While the district court concluded that no constitutional violation occurred, our review of the record persuades us that the prosecutor's tactics may well have resulted in Thompson's receiving a fundamentally unfair trial. These tactics, including the use of the two highly dubious jailhouse informants, appear to compound the constitutional violations that flow from defense counsel's ineffective performance.
 
 
 18
 When we examine the totality of the circumstances (both substantive and procedural), the grave questions that exist regarding Thompson's innocence of any capital offense, the likelihood that the panel's decision is erroneous, and the consequences that would flow from allowing an erroneous decision to go unreviewed, we are persuaded that the circumstances involved are extraordinary.
 
 C.
 
 19
 Before we may recall the mandate, we confront a chicken and egg dilemma. In most cases, to justify recalling the mandate, we must conclude that there is substantial doubt as to whether the panel erred and that recall is necessary to prevent manifest injustice. By the same token, we cannot reexamine the panel's decision and rule on the merits without having recalled the mandate. This process is not unlike determinations in respect to standing; the court must peek under the corner of the rug at the merits to determine what is at stake before knowing whether the parties have standing enabling the court to exercise its jurisdiction to determine the merits. Our inquiry here thus has a two-fold objective: First, we must determine whether the panel may have been wrong, and whether if we fail to act we may be perpetrating a manifest injustice; if so, we must recall the mandate. Second, once we do, we must determine on the merits whether habeas relief should be granted.
 
 
 20
 We recognize, as Judge Hall's dissent notes, that our court recently has rejected a petitioner's motion to recall the mandate which was clearly an effort to circumvent the procedural bars embodied in the AEDPA. See Nevius, 105 F.3d at 461-62. But the dissent overlooks that in Nevius, we explicitly stated that "Nevius wants us to recall our mandate ... not to nullify an erroneous decision, but to reopen the proceeding so that he may present new claims that now cannot be addressed in a subsequent petition." Id. at 461 (emphasis added). This statement recognizes the principles embodied in the cases we cite here; i.e., that the mandate may be recalled to correct an erroneous decision which would result in a manifest injustice.
 
 
 21
 Moreover, our rejection of the motion to recall the mandate in Nevius, and in other death penalty appeals, see, e.g., Greenawalt v. Stewart, 105 F.3d 1268, 1278 (9th Cir.1997), merely substantiates that here, exceptional circumstances caused a majority of the active judges of this court to vote in favor of allowing an en banc court to determine whether to recall the mandate.
 
 
 22
 Our initial examination of this case leaves us with "a firm belief that this is the exceptional case requiring recall of the mandate in order to prevent an injustice." Verrilli v. City of Concord, 557 F.2d 664, 665 (9th Cir.1977). We believe just as strongly that it is necessary to do so in order to protect the integrity of our process. For all of the reasons we have heretofore discussed, we order the mandate recalled.
 
 
 23
 Only an en banc panel court may overrule an earlier decision by a panel of this court. See Fed. R.App. P. 35(a)(1); Ninth Cir. R. 35-1. A majority of the active judges of this circuit has voted to rehear en banc the panel's refusal to recall the mandate, and this en banc court has now determined that it shall be recalled. Implicit in our power to do so is our authority to reconsider the merits of the case as an en banc court. See Songer v. Wainwright, 769 F.2d 1497 (11th Cir.1985) (after panel denied motion to recall the mandate, a majority of the court voted to recall the mandate and reconsider the appeal en banc); Uzzell v. Friday, 625 F.2d 1117, 1122 (4th Cir.1980) (Widener, J., dissenting) (court on its own motion recalled the mandate of the panel decision and ordered rehearing en banc on the merits). Thompson's appeal from the district court's decision, and the State's cross-appeal, are now properly before this en banc court, and we turn to the merits of those appeals.
 
 II. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 24
 We now review the district court's partial grant of Thompson's habeas petition. Sanders v. Ratelle, 21 F.3d 1446, 1451 (9th Cir.1994). We must consider the district judge's determinations on both the performance and prejudice prongs of the ineffective assistance of counsel test. See Strickland, 466 U.S. at 698, 104 S.Ct. at 2070. Although Thompson must rebut the "strong presumption" that his trial counsel provided adequate assistance and exercised reasonable professional judgment in representing him, id. at 690, 104 S.Ct. at 2066, the district court's factual findings are entitled to the usual deference. Hendricks v. Calderon, 70 F.3d 1032, 1036 (9th Cir.1995) (noting that although an ineffectiveness claim presents a mixed question of law and fact, reviewed de novo, the district court's factual findings should be accepted unless clearly erroneous). We find ineffective assistance only when counsel's performance falls below a reasonable standard of professional representation and when counsel's deficient representation undermines our confidence in the outcome of the trial. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir.1995).
 
 
 25
 A. Failure to rebut forensic evidence of rape
 
 
 26
 To support the rape case against Thompson, the State called the coroner, Dr. Richards, to testify. Richards testified that in his autopsy of Fleischli he found bruises on her ankles, palms, wrists, right elbow, and right knee, as well as a "crushing injury" to her right wrist. Richards testified that except for the right knee, the injuries had all occurred at or near the time of death and were the result of heavy handling. Richards also testified that he found no vaginal tearing or bruising, but that such tearing or bruising is not necessary to indicate rape.
 
 
 27
 Thompson's trial counsel, Ronald Brower, cross-examined Richards only on the question of whether there was vaginal tearing. He did not cross-examine Richards at all regarding the bruises, although on redirect examination Richards stated that evidence of bruising to the body could indicate rape. Richards also testified that he found no "anatomical" evidence of rape, but that sperm and semen analysis might provide such evidence. Brower did not cross-examine Richards to clarify these statements.
 
 
 28
 At the evidentiary hearing before the district court, Thompson presented the testimony of Dr. Root, an independent pathology expert in whom Brower had consulted, but had not called as a witness. Root testified that he had reviewed the autopsy report and that, if called, he would have testified that the bruises described in the report were several weeks old, with the exception of the wrist injury. Root opined that the bruises on Fleischli's hands were the result of livormortis, not injury, and that the time of the right wrist injury could not be estimated accurately because of the lack of cellular response.
 
 
 29
 Root further testified that the coroner's report showed that there was no semen drainage in the crotch of Fleischli's tight jeans, which were zipped and belted and which she wore without underpants. Fleischli's vaginal swab revealed recent semen with "infrequent" sperm. Both the lack of drainage and the infrequent sperm suggested that Fleischli had douched or washed after sex, consistent with consensual sex but not with rape followed by murder.
 
 
 30
 Brower testified at the evidentiary hearing that he had not pursued further consultations with Root because he feared that if he decided not to use Root as a witness, the prosecutor would find out and use that fact against him. The district court soundly rejected this specious argument, reminding Brower that the prosecutor could not have introduced evidence that Brower had consulted with but not called an independent pathologist. Brower also testified that he cross-examined Richards only on the vaginal tearing issue, and not on the bruising, because Richards earlier had informed Brower that there was "no anatomical evidence" of rape, and Brower wanted to make sure Richards testified consistently with that opinion.
 
 
 31
 Brower admitted that he knew the prosecution would argue that the bruising evidenced rape, but he testified that he planned to argue to the jury that David Leitch, not Thompson, inflicted those bruises. Brower testified that he did not think it was "necessary" to rebut Richards' evidence about the bruises. Finally, Brower testified that he did not recall learning of the lack of drainage in Fleischli's jeans or of the significance of that evidence. Brower somehow found it unnecessary to pursue readily available evidence that would have undermined the State's rape case because his theory was that Leitch raped Fleischli, not that no rape occurred.
 
 
 32
 The district court found, and the panel assumed, that Brower's failure to investigate, develop, and present evidence rebutting the State's forensic evidence of rape fell below a reasonable standard of professional representation. As we have noted, the district court found that defense counsel "had no valid tactical reason for not attacking the rape evidence." Like the district court, we cannot find that Brower's purported choice was professionally reasonable.
 
 
 33
 Brower's theory that Leitch raped Fleischli was inconsistent with his reliance on the coroner's statement that there was "no anatomical evidence of rape." Brower irrationally devoted much of his defense to this theory, rather than advancing the theory that no rape had taken place. The existence of a rape conviction exposed Thompson to the death penalty on two possible grounds: felony murder and murder with rape as a special circumstance. By not rebutting the prosecution's rape evidence, Brower unnecessarily risked Thompson's life, ostensibly in order to pursue an alternative theory of the case.[4] We agree with the district court that Brower's performance in this respect was constitutionally deficient.
 
 
 34
 We also conclude, as did the district court, that Brower's failure to attack the rape evidence was prejudicial. Richards' testimony provided the State's strongest evidence on the rape charge. As the district court found, if Brower had "negated the rape, he would have cast considerable doubt on Thompson's role in the murder.... Without the rape, theory, Thompson had no obvious motive to kill Fleischli." Had Brower impeached the coroner's testimony, the State would have been left mainly with evidence that Fleischli's vaginal swab contained semen consistent with Thompson's blood type and Thompson's testimony that he had consensual sex with Fleischli on the night of her death.[5] This evidence could not have sustained a rape conviction.[6] Thus, absent Brower's ineffectiveness, the outcome of Thompson's trial would in all probability have been different--he most likely would not have been convicted of the rape or the rape special circumstance, and therefore could not have been sentenced to die. Had Brower adequately challenged the State's rape charge, he would have "put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). We can think of no error more prejudicial than one that is the precipitating cause of an erroneous death sentence.
 
 B. Failure to impeach Fink
 
 35
 At Thompson's trial, the State called Edward Fink, a jailhouse informant, who testified that Thompson had admitted raping and murdering Fleischli. Fink testified that he had come forward with Thompson's confession on his own initiative and that in exchange for his statement he asked only that he be allowed to serve his parole violation sentence in Chino. Fink also admitted to four prior felony convictions.
 
 
 36
 Brower cross-examined Fink and elicited that Fink had spoken twice with law enforcement officers about Thompson's case. Brower also produced Fink's rap sheet, which listed his additional felonies and numerous aliases. Brower also inquired into Fink's history of drug abuse, and got Fink to admit that he was known as an informant.
 
 
 37
 There was, however, far more to the story of perennial informant Fink. At the evidentiary hearing, Thompson produced Fink's extensive history as an informant who frequently claimed that fellow inmates confessed their crimes to him while awaiting trial and who frequently received favors in exchange for cooperating with the police. Joel Baruch, a defense attorney, testified that in another capital case, in which he represented the defendant, he had discovered Fink's informant history, including statements in Fink's file by law enforcement officers that Fink was an unreliable informant, a con man, and a heroin addict. Baruch testified that after he repeatedly advised the prosecutor in his case that he was well aware of Fink's background, the case was dismissed. Thompson also offered a transcript of Fink's testimony in People v. Goldstein, a 1980 California murder trial. Goldstein's counsel cross-examined Fink at length, and he undermined Fink's credibility by showing that Fink regularly informed to law enforcement officers in exchange for future favors and probably had fabricated Goldstein's confession.
 
 
 38
 Brower testified at the evidentiary hearing that he had stopped investigating Fink's background before trial because he believed he had enough material to cross-examine Fink, and that he had stopped cross-examining him because he thought the judge was getting restless and the jury had "gotten the message." Like Brower's excuse for not calling an independent forensic expert, this feeble explanation underscores Brower's ineffectiveness. Brower readily could have obtained evidence about Fink's background as an informant and the favors he received in exchange for his frequent testimony. Of particular relevance to Thompson's case was the fact that Fink was released from his parole hold soon after he provided the information that incriminated Thompson. Rather than investigating Fink's background or requesting discovery from the prosecutor regarding Fink, Brower focused on Fink's drug use and on whether Fink in fact had been in sufficient proximity to Thompson to obtain the alleged confession. Given the crucial import of Fink's testimony, Brower's conduct in failing adequately to impeach him fell well below a reasonable standard of professional representation.
 
 
 39
 Brower's failure to investigate and impeach Fink severely prejudiced Thompson. Brower could have destroyed Fink's credibility. Without Fink's testimony, the State's rape case against Thompson would have been dramatically weaker. We are in accord with the district court; Brower's ineffective assistance in defending against the forensic evidence and against Fink's testimony fatally undermines our confidence in the outcome of Thompson's rape conviction. See Kyles, 514 U.S. at 434-35, 115 S.Ct. at 1566. Without the rape finding, Thompson could not have been sentenced to death. Brower's ineffective performance therefore prejudiced not only the rape conviction and the rape special circumstance, but the ultimate outcome: the finding of death eligibility and the imposition of a capital sentence.
 
 C. Failure to impeach Del Frate
 
 40
 A second informant, John Del Frate, also testified at Thompson's trial. The district court concluded that Brower readily could have discovered and presented substantially more impeaching evidence against Del Frate. In particular, Brower failed to show that Del Frate's testimony that Thompson said he stabbed Fleischli in the torso and buried her in a "shallow grave" was both false as to what happened to Fleischli and, even more important, parroted almost verbatim inaccurate news reports. Brower also failed to discover that Del Frate had served as an informant since the age of fourteen, that two police agencies for whom Del Frate informed considered him unreliable, that Del Frate's family considered him to be a pathological liar, and that Del Frate had shared a cell with Leitch for several weeks before coming into contact with Thompson. The panel's conclusion that "Brower could hardly have impeached Del Frate more than he did" is patently wrong.
 
 
 41
 Brower's failure to investigate and impeach Del Frate, whose testimony he admitted was important to the prosecution's case, was unconstitutionally deficient. It also was prejudicial. As the prosecutor himself stated in his closing argument, Fink and Del Frate's testimony provided the dispositive evidence that Thompson had raped Fleischli and murdered her to cover up the rape. Had Brower impeached Del Frate, as well as Fink, the prosecution's rape case against Thompson would have been substantially weakened. Brower's cumulative errors in failing to investigate and impeach the jailhouse informants and to rebut the forensic evidence of rape cast grave doubt on the reliability of the rape conviction and the rape special circumstance finding, and thus of the death sentence itself.
 
 
 42
 For all of the reasons we have previously discussed, we grant Thompson's writ of habeas corpus with respect to the rape count, the rape special circumstance allegation, and the capital sentence.
 
 III. PROSECUTORIAL MISCONDUCT
 
 43
 There is an alternate ground that also requires the relief we order. In his habeas petition before the district court, Thompson claimed that the prosecutor's use of fundamentally inconsistent theories at his and Leitch's trials violated due process. The district court rejected this argument, and the panel affirmed that conclusion. Having carefully reviewed the record, and having given due deference to the district court's analysis, we conclude that we must reverse on this ground as well.
 
 A. The pretrial phase
 
 44
 At the preliminary hearing, when Thompson and Leitch were still joined as co-defendants, Deputy District Attorney Daniel Brice asserted that Leitch wanted Fleischli dead, and that he enlisted Thompson to join in the killing. In support of this theory, the prosecution presented the testimony of four jailhouse "informants" who claimed to have obtained confessions from Thompson: David Vogel, David Wright, Timothy Gravelle, and Robert Evans. Each informant told essentially the same story: Leitch wanted Fleischli dead for interfering with his attempts to reconcile his relationship with his ex-wife, Tracy Leitch, and, therefore, had recruited Thompson to help him kill her. According to Vogel's testimony, Thompson had told him that on the night of the murder, he engaged in consensual sex with Fleischli.[7] Then, when Leitch returned home, the two executed Leitch's "plan," and killed Fleischli. The State charged both men with capital murder based on rape and murder of Fleischli.
 
 
 45
 At the close of the preliminary hearing, the magistrate found that there was insufficient evidence to hold Thompson and Leitch on the rape charge and the rape special circumstance allegation. Nonetheless, the State filed an information charging Thompson and Leitch, inter alia, with murder, rape, and rape as a special circumstance.
 
 
 46
 After the information was filed, Deputy District Attorney Michael Jacobs replaced Brice as lead counsel for the prosecution. Jacobs then reviewed all of the tapes, police reports, forensic reports, and court transcripts in the case. Those records, among other things, described Leitch's violent history, Leitch's past threats toward Fleischli, Leitch's desire to reconcile with his ex-wife[8] and his perception that Fleischli was an impediment to that goal, physical evidence that tied Leitch to the crime, and Leitch's inconsistent statements to police following the crime.
 
 
 47
 Upon reviewing the evidence, Jacobs concluded that he would continue to pursue murder-with-special-circumstance convictions against both defendants, on the theory that Leitch had the motive for killing Fleischli, and that both men were equally culpable for raping and murdering her. On his own admission, Jacobs never altered his view of the motive and the crime, either before or after he won Thompson's conviction.
 
 
 48
 Some months later, Thompson and Leitch moved under California Penal Code § 995 to set aside the rape charge and the rape special circumstance allegation as unsupported by probable cause. At the hearing, at which the record shows Jacobs to have been present, one of his assistants represented to the court that "[Leitch] is the only person throughout the record who has a motive.... According to [Tracy Leitch,] David Leitch was negotiating a reconciliation with Tracy Leitch and Ginger Fleischli was not reacting very cooperatively to that circumstance, and there is the motive--she was in the way." The trial court denied the defendants' motion without comment.
 
 
 49
 Leitch then moved successfully to sever his trial from Thompson's. The prosecutor elected to try Thompson first.[9]
 
 B. The trials of Thompson and Leitch
 
 50
 The prosecutor's pursuit of fundamentally inconsistent theories is evident from the transcripts of the two trials. In the second trial, the prosecutor presented essentially the same theory used at the pretrial proceedings. Yet, in between those court proceedings, the prosecutor convicted Thompson under an entirely different theory, and argued critical facts to Thompson's jury that were at odds with those presented both in the preliminary hearing and Leitch's trial.
 
 
 51
 The prosecutor presented markedly different and conflicting evidence at the two trials. At Thompson's trial, the prosecutor did not call any of the four jailhouse informants who had testified at the preliminary hearing and claimed that Thompson had confessed to them. Instead, he called two new jailhouse informants, Fink and Del Frate, who also claimed that they were the recipients of Thompson's confession, but who told an entirely different and factually inconsistent story. Contrary to the testimony of the earlier informants, the two new informants testified that Thompson had told them that he had raped Fleischli and had killed her before Leitch returned home, and that he killed her in order to prevent her from reporting the rape.[10] Fink further testified on direct examination that Leitch found out about the murder only when he returned home, and that he merely assisted Thompson in disposing of the body because Thompson convinced him that they should go to Mexico together. The testimony of Fink and Del Frate provided the only direct evidence that (1) Thompson killed Fleischli, (2) Fleischli was raped, and (3) Thompson raped her. The prosecutor termed the two informants' testimony "dispositive" and "very, very damaging" because they had "no reason whatsoever [to] lie." The latter statement is patently untrue, as demonstrated by the fact that shortly after Fink incriminated Thompson, his parole hold was dropped and he was released from jail on the basis of favorable information provided by law enforcement officials.
 
 
 52
 The prosecutor did not call either Fink or Del Frate at Leitch's trial. Instead, he called defense witnesses from Thompson's trial (most of whom he had subpoenaed for Leitch's trial immediately after objecting to their testimony at Thompson's trial). These witnesses testified about Leitch's violent disposition, Leitch's threats toward Fleischli, and Leitch's motive to kill Fleischli. The prosecutor relied heavily on their testimony to establish Leitch's motive for the murder.
 
 C. Closing arguments
 
 53
 The glaring inconsistency between the prosecutor's theories, arguments, and factual representations at the two trials is apparent when one juxtaposes his closing arguments.
 
 
 54
 At Leitch's trial, the prosecutor argued that:
 
 
 55
 [Leitch is] the only one, before the victim's death, who expressed any hatred for her and the only one with any motive for her death.
 
 
 56
 ....
 
 
 57
 [Leitch's desire to reunite with his ex-wife is] really the only motive we have in this case, and people have killed for less.
 
 
 58
 ....[Leitch's] was the only motive or reason for her demise.
 
 
 59
 (Emphasis added).
 
 
 60
 Yet at Thompson's trial, the prosecutor advanced a contrary motive for Fleischli's death. He asserted that the sole motive was Thompson's desire to cover-up the alleged rape:
 
 
 61
 Why did Ginger Fleischli die? Because she said she was going to tell for what he [Thompson] did to her. So he killed her.
 
 
 62
 What did both Mr. Fink and Del Frate say? What do both of their statements have in common? [Thompson] didn't want any witnesses.
 
 
 63
 ....
 
 
 64
 The defendant said he raped the victim and killed her to prevent being caught for rape.
 
 
 65
 (Emphasis added).
 
 
 66
 At Leitch's trial, the prosecutor adhered to the State's original theory that Leitch was an active participant in the murder:
 
 
 67
 And I want to make it very clear that the State has charged Mr. Leitch with first degree murder, and with special circumstances. And as far as we are concerned, he's guilty of that or he's guilty of nothing.
 
 
 68
 ....
 
 
 69
 The problem is, all of the evidence we have incriminates Mr. Leitch, at best, equally, and more so than Mr. Thompson.
 
 
 70
 ... Both men were together inside that apartment with Ginger Fleischli.
 
 
 71
 ....
 
 
 72
 So we have to ask ourselves, why would Mr. Thompson murder Miss Fleischli alone in an apartment where he lived, with no transportation, no means to move the body and wait for Mr. Leitch to come home to be an A-1 witness for the murder of his ex-girlfriend? Is that reasonable or logical? Do you think that's what happened?
 
 
 73
 ....
 
 
 74
 You think Mr. Thompson did this all by himself and waiting for this good guy to come home so he could see him standing over his ex-girlfriend, who he lived with ten days before? No, it didn't happen that way.
 
 
 75
 (Emphasis added).
 
 
 76
 The prosecutor, however, asserted as the truth before Thompson's jury the story he subsequently labeled absurd and incredible in Leitch's trial:
 
 
 77
 ... [Thompson] was the only person in that apartment with Miss Fleischli the night--at the time she was killed.
 
 
 78
 ....
 
 
 79
 We have the evidence that establishes Mr. Thompson alone in an apartment with a girl who is raped and murdered.
 
 
 80
 ....
 
 
 81
 The David Leitch involvement--we have all this stuff on the board about him saying bad things about his girlfriend. What evidence do we really have that he did anything, had any part except that his car was used to move the body and that his shoe print was at the scene? There is no evidence we have putting him in the apartment that night.
 
 
 82
 (Emphasis added).
 
 D. Post-trial theory
 
 83
 Not surprisingly, the prosecution's original theory continued to prevail after the trials were concluded. The prosecutor submitted the following statement for use in Leitch's future parole proceedings: "Fleischli was bound and gagged ... by [Leitch and Thompson] ... and was then stabbed ... by one or both of the defendants." He made no mention of any rape.
 
 E. Due process analysis
 
 84
 We are left with a picture of the prosecutor's temporary abandonment during Thompson's trial of the theory he presented, and supported with evidence, at the preliminary hearing, in the pretrial motions, and again at and after Leitch's trial. The prosecutor manipulated evidence and witnesses, argued inconsistent motives, and at Leitch's trial essentially ridiculed the theory he had used to obtain a conviction and death sentence at Thompson's trial. The question before us is whether this prosecutorial misconduct violated Thompson's right to due process and a fair trial.
 
 
 85
 The Supreme Court has long emphasized our Constitution's "overriding concern with the justice of finding guilt." United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). In particular, the Due Process Clause guarantees for every defendant the right to a trial that comports with basic tenets of fundamental fairness. Lassiter v. Department of Soc. Servs., 452 U.S. 18, 24-25, 101 S.Ct. 2153, 2158-59, 68 L.Ed.2d 640 (1981); see also Turner v. Louisiana, 379 U.S. 466, 471-72, 85 S.Ct. 546, 549-50, 13 L.Ed.2d 424 (1965); In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625-26, 99 L.Ed. 942 (1955).
 
 
 86
 The prosecutor, as the agent of the people and the State, has the unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice. The Supreme Court recognized, over sixty years ago, that
 
 
 87
 [b]ecause the prosecutor is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer ..., [i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one.
 
 
 88
 Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), overruled on other grounds by Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).
 
 
 89
 This court has reaffirmed that this duty of furthering just convictions "is [the prosecutor's] highest purpose." Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir.1983). In United States v. Kojayan, 8 F.3d 1315, 1323 (9th Cir.1993), we further stated: "While lawyers representing private parties may--indeed, must--do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." See also United States v. Kattar, 840 F.2d 118, 127 (1st Cir.1988) (stating that the function of the prosecutor "is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible"); Bruno, 721 F.2d at 1195.[11] This is so because "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of justice suffers when any accused is treated unfairly." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).
 
 
 90
 The prosecutor may not "[become] the architect of a proceeding that does not comport with the standards of justice." Id. The prosecutor, therefore, violates the Due Process Clause if he knowingly presents false testimony--whether it goes to the merits of the case or solely to a witness's credibility. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).[12] Moreover, the prosecutor has a constitutional duty to correct evidence he knows is false, even if he did not intentionally submit it. Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).
 
 
 91
 From these bedrock principles, it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime. Then-judge Kennedy wrote for our court that when there are claims of inconsistent prosecutorial conduct, reversal is not required where the underlying theory "remains consistent." Haynes v. Cupp, 827 F.2d 435, 439 (9th Cir.1987). Here, little about the trials remained consistent other than the prosecutor's desire to win at any cost.
 
 
 92
 Drake v. Kemp, 762 F.2d 1449 (11th Cir.1985) (en banc), bears remarkable similarities to our case. There, the State charged two men with murder and armed robbery. The State prosecuted the first defendant, Campbell, on the theory that Campbell alone committed the murder. But in the second defendant's trial, the State asserted that Campbell, due to illness, was physically incapable of killing the decedent. Rather, the State argued, the second man, Drake, must have "actually beat the victim," and, in support of this theory, the State presented Campbell as its star witness. Id. at 1472 (Clark, J., concurring). On direct examination, Campbell recited the same testimony that the State had refuted at Campbell's trial. Drake was convicted of murder and robbery.
 
 
 93
 The court granted habeas relief on other grounds, but Judge Clark wrote separately to emphasize that the prosecutor's actions of advancing inconsistent theories constituted a "fundamental and egregious error" that violated the Due Process Clause. Id. at 1470 (Clark, J. concurring). Judge Clark reasoned:
 
 
 94
 [T]he prosecution's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip flopping of theories of the offense was inherently unfair. Under the peculiar facts of this case the actions by the prosecutor violate the fundamental fairness essential to the very concept of justice. Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941). However, it makes no sense to say that only Campbell's due process rights were violated by the inconsistent theories.... This is especially true in this case because the fingerprints, blood tests, and a witness linked Campbell and not Drake to the crime. That evidence is highlighted by Campbell's subsequent recantation.
 
 
 95
 The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth. In prosecuting Campbell and Drake for the murder of Mr. Eberhart, the prosecutor changed his theory of what happened to suit the state. This distortion rendered Henry Drake's trial fundamentally unfair.
 
 
 96
 Id. at 1479 (Clark, J., concurring).
 
 
 97
 We believe that Judge Clark's concurrence expresses well the principles that govern the case before us. We disagree with the panel's statement that if any party suffered from the prosecutor's conduct, it was Leitch, not Thompson. To the contrary, Thompson was prejudiced. From the beginning, the prosecutor's theory was that the murder resulted from Leitch's plot to eliminate his former girlfriend, who impeded his reunion with his ex-wife and her money, and that both Leitch and Thompson were involved in the actual killing. Only in Thompson's trial did the prosecutor change the theory and the arguments, and offer facts that directly conflicted with the underlying premise of the charges he brought. Only in Thompson's trial did the prosecutor assert that Thompson was alone in the apartment and killed Fleischli to cover up a rape. Only in Thompson's trial did the prosecutor use as witnesses Fink and Del Frate, who were known to law enforcement officers to be wholly unreliable. In Leitch's trial, the prosecutor returned to his original theory and discredited the very evidence he had previously offered in Thompson's trial. Thus, Thompson, rather than Leitch, suffered from the due process deprivation that infected the conflicting prosecutions.
 
 IV. MURDER CONVICTION
 
 98
 Finally, consideration must be given to the effect of our vacatur of the rape conviction on the first-degree murder conviction. Thompson contends, with some force, that the conviction cannot stand because, inter alia, the jury was instructed under the felony murder doctrine. However, the district judge did not address that issue, nor did he discuss the murder conviction in his opinion, except to say, "as to the murder charge, ... the writ of habeas corpus is denied." Accordingly, we remand the question of the murder conviction to the district court for its initial consideration in light of our vacatur of the rape conviction.
 
 CONCLUSION
 
 99
 Having recalled the mandate, we vacate the panel's decision and affirm the district court with respect to the rape conviction, the rape special circumstance, and the death penalty. We remand the first degree murder conviction to the district court for further consideration in light of this action. We grant Thompson's writ of habeas corpus in part and order that the State vacate its order of execution. The district court shall enter the partial writ unless the State elects to retry Thompson within a reasonable time. The vacatur of the execution order shall be effective immediately. The mandate shall issue forthwith.
 
 
 100
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED; EXECUTION ORDER VACATED.
 
 REINHARDT, Circuit Judge, concurring:
 I.
 
 101
 I concur wholeheartedly in Judge Fletcher's opinion for the court. Regretfully, however, I cannot let Judge Kozinski's extraordinary dissent pass unchallenged. Because we cannot delay filing any longer, I am able to comment on that unfortunate document only very briefly.
 
 
 102
 Perhaps to those who read his recent musings in The New Yorker magazine regarding his personal experiences in voting in death penalty cases,[1] Judge Kozinski's rambling analysis will come as no surprise. Others surely will be astounded by some of the conclusions he reaches and some of the factual errors he makes. I have time to note only one of each:
 
 
 103
 First, Judge Kozinski's conclusion that the en banc process is not available when the objective is to correct specific constitutional errors that will result in the execution of a person who cannot lawfully be executed misses the point not only of our en banc process but of our justice system as a whole. Of course our en banc process is available to correct such grievous and otherwise irremediable errors. Judge Kozinski writes:
 
 
 104
 If the en banc call is missed for whatever reason, the error can be corrected in a future case where the problem again manifests itself. Since any problem worthy of en banc consideration will perforce appear again and again, missing an en banc call in a single case does not terminate forever the opportunity of judges troubled by the error to raise the issue....
 
 
 105
 That this is a capital case does not change this calculus.
 
 
 106
 This conclusion is bizarre and horrifying in its implications, and is unworthy of any jurist. We cannot correct the error of an unconstitutional execution in the next case. Surely no responsible judge could believe otherwise.
 
 
 107
 Second, contrary to what Judge Kozinski represents in his dissent, the entire court was immediately notified of the three-judge panel's unprecedented refusal to permit two judges of this court a brief extension of time in which to make an en banc call. In addition, before our mandate was spread in the district court, two other judges also requested that a belated en banc call be entertained. Again, the entire court was notified immediately.
 
 
 108
 This is a court which has been marked by collegiality and fairness. We work well together and are all, without exception, proud of this institution. We will all continue in that vein when this case is over. Nevertheless, it is essential to observe that the refusal to permit a late en banc call was contrary to our custom and practice and was indeed aberrational and extraordinary, as is Judge Kozinski's dissent.
 
 
 109
 One might think that some of us had forgotten that we are construing a Constitution, examining the question whether a fair trial was held, considering whether a strong possibility of actual innocence exists, and determining whether under our system of law a man should live or die. Reading Judge Kozinski's strange dissent, one would think that justice is irrelevant in this nation and that all that matters in our system of law is whether a single piece of paper was misplaced in a judge's chambers, or whether some recondite internal General Order was complied with to the last detail. That is surely not the type of legal system in which most of us believe. That is surely not the type of nation that we represent ourselves to be when we offer ourselves as a model of fairness and decency, democracy and civilization, throughout the world.
 
 II.
 
 110
 Judge Kozinski has chosen to add to his previously filed dissent. Accordingly, I take this opportunity to add to the brief concurrence (now section I, supra ) I was required to draft in only a few short hours. The picture Judge Kozinski paints of our court is not a fair one and does a disservice to the institution. By selective quotations from portions of internal memoranda, misrepresentations regarding historical facts, and omissions of events, some of which he may not even be aware of, he describes a cold and mechanical process that bears little resemblance to the collegial mode of operation and spirit of collaboration that has long marked the operations of this court. We simply do not do business in the unfriendly and adversarial way Judge Kozinski describes. Our internal time limits are not intended to operate as statutes of limitations and do not have the force of Federal Rules of Procedure. The critical fact, though, is that Judge Kozinski's revelations not only reveal a different judicial world than most of us are familiar with, but the revelations, even were they accurate, would be wholly irrelevant to the issue before us.
 
 
 111
 The questions the dissents principally address are whether this court's decision to recall the mandate was based on extraordinary circumstances and whether we somehow were guilty of circumventing AEDPA when we decided to hear Thompson's first habeas petition en banc. It seems apparent that if there were extraordinary circumstances that justified our sua sponte recall of the mandate in order to permit us to hear en banc a first habeas petition that we erroneously failed to review a few short months ago, there can be no possible violation of AEDPA. Accordingly, the real question is that of "extraordinary circumstances."
 
 
 112
 Surely, no-one could believe that it is an ordinary occurrence for all of the following to transpire in one case: (1) the misplacing or non-arrival in a judge's chambers of a form computer message causes a judge to miss an internal deadline for requesting en banc review of the first (and ordinarily the only possible) habeas petition in a death penalty case; (2) the judge realizes the glitch within a reasonable time and seeks such review with dispatch, as does another judge; (3) the three-judge panel unprecedentedly refuses to act favorably on the requests for an extension of time; (4) the internal rules regarding further possible action are ambiguous; (5) two other judges subsequently renew the request for en banc review of the first habeas petition prior to the time our mandate is spread; (6) several more judges urge that out of comity we wait to conduct our en banc vote until all state proceedings are completed; (7) the court will have no further opportunity to review the panel's patently erroneous decision if it fails to recall the mandate, while if it does it will be able to conduct an initial en banc hearing on a first habeas petition; (8) the experienced district judge who was reversed by the panel had found in a one-hundred page opinion after a full evidentiary hearing that the capital defendant did not receive a minimally effective defense on the charge that triggered the imposition of the death penalty; (9) the district judge had concluded that even despite the ineffectiveness of defense counsel the prosecutor failed to present substantial evidence of the charge which was the basis for the imposition of the death penalty; and (10) there is a substantial question whether the prosecutor by his unethical conduct deprived the defendant of due process of law and thus a fair trial.[2]
 
 
 113
 To suggest that all of this is just an ordinary run-of-mill occurrence and that the panel's errors may be corrected in the next en banc case is mind-boggling. Surely, if a court wishes to correct its own errors in these extraordinary circumstances, as seven members of the en banc court voted to do, the court has the authority to do so.
 
 
 114
 Judge Kozinski's dissent addresses almost exclusively the question of whether procedural errors actually occurred within the court, how and why they came about, and what our internal rules actually provide when properly construed. In one of his amendments he purports to regret that he has been required to "delve into court communications."
 
 
 115
 As far as I am concerned, Judge Kozinski's delving is not only offensive and inaccurate but it serves no purpose. His delving cannot change the fact that two judges of this court sought to have an en banc hearing held at or about the normal time and two others sought to have it held before our mandate was spread in the district court. His delving cannot change the fact that the reason that a number of judges asked to have an en banc hearing on this first habeas petition in a capital case was to permit review on the merits of a panel opinion that erroneously decided two serious constitutional questions and that, unless overturned, would result in a manifest injustice.
 
 
 116
 No one familiar with this case has suggested, or could in good conscience suggest, that anything but honest errors and strong disagreements among judges about the appropriate procedures led to the fact that we did not take an en banc vote at the regular time. If anyone were to suggest otherwise, that suggestion would be both false and reprehensible. It is true that this case reveals disagreements on the court about the circumstances under which an en banc vote may be called following non-substantive amendments to an opinion. It is true that we appear to have disagreements about a panel's obligation to honor a reasonable request for an extension of time in an en banc case. It is true that a form 5.4(b) notice may have gone astray or unnoticed. The question of why these events occurred, however, is irrelevant.
 
 
 117
 Rather, the question is whether a person who has been deprived of a fair trial, both because of the ineffectiveness of his counsel and the due process violations of the prosecutor, and who in all likelihood is actually innocent of the death-qualifying offense, should be executed because a court of appeals made good faith mistakes or had good faith disagreements as to internal court procedures and, as a result, initially failed to afford him the en banc review that it would otherwise have conducted. Should a court of appeals, in other words, be prohibited from recalling a mandate sua sponte and correcting the grave constitutional errors made by a panel of that court when the court itself is responsible for the initial failure to hold an en banc hearing and when the capital case presents substantial claims of ineffectiveness of counsel, highly prejudicial prosecutorial misconduct, and actual innocence--particularly when the district court found a substantial part of those claims to be true?
 
 
 118
 In my view, Judge Kozinski's attempt selectively to extract items from our internal correspondence[3] in an effort to show that the judges were guilty of simple, rather than excusable, neglect is wholly irrelevant. It is possible, as he suggests, that other procedural maneuvers could have been tried. That is a matter of judgment. That additional internal efforts to obtain an earlier en banc hearing were or were not pursued proves nothing. In the absence of a charge of bad faith, the specific nature of the errors really does not matter. The undisputed fact is that either because some judges inadvertently, erroneously, negligently or excusably failed to pursue the en banc call at the proper time, or because a three-judge panel arbitrarily refused to allow a late call in contravention of the court's long established practice, an en banc call did not occur at the time set by our internal rules. A majority of the judges wished to correct that error in order to remedy a manifest injustice in a capital case. The majority wished to review en banc a first habeas petition that in fact was meritorious, even though, by chance, error, or mistake, the call had not been made a few months earlier. The critical question is whether, under these extraordinary circumstances, a court of appeals is free sua sponte to recall the mandate in order to accomplish those objectives.
 
 
 119
 Judge Kozinski's essential response to the question before us can be summed up by a sentence of his that I quoted in Section I: "If the en banc call is missed for whatever reason, the error can be corrected in a future case where the problem again manifests itself." Kozinski Dissent at 1060. As I said earlier, that is not an acceptable response to those who believe that fairness and due process play some part, however small, in. our legal system, or to those who believe that individual human life is both valuable and unique.
 
 
 120
 This case is different from any other case we have had or are likely to have again. We cannot cut it into pieces, examine each piece separately and then say each piece is not unusual. Together the whole is extraordinary, probably as extraordinary a case as any of us has ever seen. Yet, to Judge Kozinski this is simply an everyday occurrence. Nothing unusual about it. We can correct the error in the next case. To the majority of this en banc court, that would come far too late. To us, this case is about a person who did not receive a fair trial and who is in all likelihood innocent of the offense of rape which underlies his scheduled execution. It is about a court that made an error not only in reversing a scrupulously careful district judge who vacated the rape conviction but also in failing to hold a timely en banc hearing at which we could have corrected our own mistake. It's about this court's ability to act to prevent a manifest injustice. It is about fairness, justice and due process of law.
 
 
 121
 TASHIMA, Circuit Judge, concurring, with whom JUDGE THOMAS joins:
 
 
 122
 I join in all of the majority opinion, except Part III, and concur in the judgment. As explained briefly below, I also concur in the major premise of Part III, but not in its result.
 
 
 123
 A homicide victim dies as a result of a gunshot wound inflicted with a single bullet. The prosecutor obtains a first-degree murder conviction of defendant A. In a separate trial, he also subsequently obtains a first-degree murder conviction of defendant B. The prosecutor's theory in each case is that the defendant on trial fired the gun. Few would argue that, at least in some circumstances, defendant A or defendant B (or both) has been deprived of due process. This is the major premise of Part III with which few would disagree. As the three-judge panel observed, "[f]rom these principles emerges the requirement that the prosecutor not pursue wholly inconsistent theories of a case at separate trials." Thompson v. Calderon, 109 F.3d 1358, 1371 (9th Cir.1996), (citing Haynes v. Cupp, 827 F.2d 435, 439 (9th Cir.1987)), cert. denied, --- U.S. ----, 117 S.Ct. 2426, 138 L.Ed.2d 188 (1997).
 
 
 124
 I agree with the major premise of Part III that due process is violated when a prosecutor "pursue[s] wholly inconsistent theories of a case at separate trials." Id. I also agree with the majority that the prosecutor's theories in the two trials involved here were "fundamentally inconsistent" and, thus, violated due process.
 
 
 125
 The three-judge panel found no prejudice from the prosecutor's conduct and "[f]urther, we conclude that if any prejudice resulted from the differences in emphasis it would have affected Leitch, not Thompson." Id. (citation omitted). The majority opinion concludes that "[t]o the contrary, Thompson was prejudiced." To reach a conclusion of prejudice or no prejudice as to Thompson first requires a finding of which of the two inconsistent theories pursued by the prosecutor represents the true facts and which is false. In the absence of a district court finding on the issue, the majority has made its own finding.[1]
 
 
 126
 Thus, although I agree that there was a due process violation, absent a finding of which version is true, I am unprepared to decide whether or not Thompson was prejudiced by it.[2] Because I am unprepared to make that finding on appeal on this record, I would remand to the district court for an evidentiary hearing on this issue.
 
 
 127
 HALL, Circuit Judge, with whom T.G. NELSON, and KLEINFELD, Circuit Judges join, dissenting:
 
 
 128
 We dissent from the majority's unprecedented and arbitrary exercise of the court's power to recall our mandate.
 
 I.
 
 129
 By recalling the mandate, and reconsidering the merits of our original opinion, the court has encouraged and enabled Thompson's attempt to end run the restrictions of the Antiterrorism and Effective Death Penalty Act ("the AEDPA"). The AEDPA requires that a habeas corpus petitioner base a second or successive application on a new rule of constitutional law or newly discovered facts that establish by clear and convincing evidence that no reasonable jury could have found guilt in the absence of constitutional error. 28 U.S.C. § 2244(b)(2). It also requires that any claim already presented in a prior application must be dismissed. 28 U.S.C. § 2244(b)(1). Finally, the petitioner must file an application making a prima facie showing that he meets these requirements and receive our permission before he can file a second petition. 28 U.S.C. § 2244(b)(3). We have expressly forbidden the recall of our mandate simply to avoid these procedural bars. Nevius v. Sumner, 105 F.3d 453, 461-62 (9th Cir.1996). Otherwise, the successive petition constraints of the AEDPA are a dead letter.
 
 
 130
 Thompson's motion to recall the mandate is not--and no one should think it is--a request to recall the mandate for a genuine reason. It is, pure and simple, an attempt to skirt the AEDPA's successive petition requirements. Thompson's motion to recall the mandate was based exclusively on claims of newly discovered evidence.[1] That motion was virtually identical, as counsel admitted at oral argument, to his Rule 60(b) motion filed in district court the same day.[2] If we treat the motion as a successive petition, as Rule 60(b) motions are and as this motion ought to be, the en banc court has no jurisdiction to entertain it. The court has not given permission for a successive petition to be filed, and indeed Thompson disclaims any intention of filing one. The en banc court therefore lacks jurisdiction under the AEDPA to go further.
 
 
 131
 When the majority disclaims Thompson's reliance on newly discovered evidence and bases its recall on the opinion reported at 109 F.3d 1358, it blatantly disregards the AEDPA and the Federal Rules of Appellate Procedure. Congress has made it very clear that a petitioner may not present for a second time claims which failed in prior habeas petitions. See 28 U.S.C. § 2244(b)(1). If Thompson tried solely to revisit the claims rejected in his first petition, his second petition (no matter how it is cloaked) must be dismissed by the court. 28 U.S.C. § 2244(b)(3)(B)-(C). The court's denial of such an application is not appealable and may not be the subject of a petition for rehearing. 28 U.S.C. § 2244(b)(3).[3] Although we maintain the power to recall our mandate, we cannot exercise that power in violation of our statutory jurisdiction.
 
 II.
 
 132
 There are no "exceptional circumstances" justifying recall of the mandate in this case. The court's opinion filed today does not claim that there has been an intervening change in the law that would require us to revisit our settled judgment, nor does it rely upon any allegedly new facts supporting a claim of "actual innocence." What purports to be exceptional in this case is the neglect of two judges to make a timely call for en banc review upon belatedly deciding that they wished they had called one when they first received notice. While the majority gives lip service to the "exceptional circumstances" standard for recalling the mandate, the reasons given, oversight of two judges of this court, would not even rise to the level of "excusable neglect" under Rule 6(b) of the Federal Rules of Appellate Procedure. See Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd., 507 U.S. 380, 392, 113 S.Ct. 1489, 1496, 123 L.Ed.2d 74 (1993) ("inadvertence, ignorance of the law or mistakes construing the rules do not usually constitute 'excusable' neglect"), quoted in Committee v. Yost, 92 F.3d 814, 824 (9th Cir.1996) (Fletcher, J.).
 
 
 133
 When discussing "excusable neglect" in Pioneer, the Court said that the inquiry is an equitable one, taking into account all relevant circumstances, id. at 395, 113 S.Ct. at 1498, which include "the risk of prejudice to the nonmoving party, the extent of the delay, and the potential effect on judicial proceedings, the reason for the delay and whether the moving party acted in good faith." Reynolds v. Wagner, 55 F.3d 1426, 1429 (9th Cir.1995). The majority's narrow focus on the neglect of two members of this court leads it to wipe from the books everything that has since happened, including the Supreme Court's denial of Thompson's petition for certiorari, the denial of his successive petition by the California Supreme Court, the denial of his Rule 60(b) motion by the district court, and the denial of his motion to recall the mandate by the panel. This neglect cannot be used to reverse the system of justice that has proceeded as a result of, and in reliance on, this court's final judgment.
 
 
 134
 Even worse, the majority only looks to that inexcusable neglect as part of the "totality of circumstances." According to the majority, recall of our mandate does not rely exclusively upon procedural "misunderstandings." Without assigning any factor particular weight, the majority also weighs Thompson's claims that: (1) he may be innocent; (2) the panel's decision may be wrong; and (3) the consequences are serious. Maj. Op. at 1051. These contentions are remarkably common and many a failed habeas petitioner will believe that he fits into a similar "totality of circumstances." In short order, this court will be flooded by motions to recall our established decisions. Worst of all, citing this case as precedent, many of these petitioners will be heard despite being barred by the AEDPA from seeking relief.III.
 
 
 135
 Not only does the en banc court lack jurisdiction under the AEDPA, but it lacks authority under the court's rules to do anything more than what it was authorized to do when the court voted to go en banc. The active judges of this court voted to rehear the panel's decision which denied the motion to recall the mandate. Because there has never been a vote on whether to take the initial panel decision en banc, in effect the majority's approach amounts to a waiver of the requirement in section 5.4.b. (2) of our General Orders that an en banc call be made within 14 days after the panel gives notice that it rejects a party's suggestion for en banc rehearing.[4]
 
 
 136
 The notion that an en banc court can itself decide whether to set aside our General Orders and authorize its own untimely en banc review of a panel decision suggests it can improperly bypass the General Orders themselves. Suspension of the General Orders can come only upon a proper two-thirds vote of the court, which, itself must follow the appropriate procedures. See G.O. 11.11.[5] If, on the other hand, the court's earlier vote to go en banc was also--sub silentio--one to set aside our General Orders and take the initial panel decision en banc, that vote failed to obtain the two-thirds majority required for the purpose. See G.O. 11.11. Thus, the merits of the initial panel decision cannot have been taken en banc as a result of that vote.
 
 IV.
 
 137
 Rather than compound the error in the court's opinion filed today, we simply state that we would reverse the district court for the reasons stated in the court's original opinion. Thompson v. Calderon, 109 F.3d 1358 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 2426, 138 L.Ed.2d 188 (1997).
 
 
 138
 With respect to the successive habeas petition (disguised as a Rule 60(b) motion further disguised as a motion to recall the mandate), we would deny Thompson's petition if the court had the jurisdiction to do so. Thompson introduces alleged newly discovered evidence of actual innocence which, he argues, compounds his assertion of constitutional error at trial. Evidence of that innocence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Schlup v. Delo, 513 U.S. 298, 316, 115 S.Ct. 851, 861, 130 L.Ed.2d 808 (1995). "[T]he evidence must establish sufficient doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." Id. As the district court properly concluded, Thompson's evidence--hearsay statements by Leitch which Leitch repeatedly contradicted--do not approach this standard. See Thompson v. Calderon, No. CV-89-3630-DT (C.D.Cal. July 25, 1997).
 
 CONCLUSION
 
 139
 The alleged newly discovered evidence, whether presented as a Rule 60(b) motion or as a request to recall the mandate, must be treated as a second and successive petition under the AEDPA. By entertaining this motion, the court nullifies Congress's clear intent in passing that act.
 
 
 140
 KOZINSKI, Circuit Judge, with whom Circuit Judge T.G. NELSON joins, dissenting.
 
 
 141
 * I agree with this much of the majority's claim that there are exceptional circumstances in this case: Not every day does a court of appeals recall the mandate in order to reconsider an argument that has already been presented to--and rejected by--the Supreme Court in a petition for a writ of certiorari. So far as I know, this is a first anywhere, anytime. What happened here, then, to justify such an extraordinary departure from orderly procedure? The majority suggests that "our normal en banc process did not function in the intended manner." Maj. op. at 1048. In fact, nothing at all unusual happened; the process operated just as it's supposed to.
 
 
 142
 Here is how it all works: All suggestions for rehearing en banc, whether or not bundled with a petition for panel rehearing, are first considered by the panel that issued the opinion. See Circuit Advisory Committee Note (4) to Rules 35-1 to 35-3. A judge who has doubts about the panel's opinion must await the panel's action before calling for a vote on whether to take the case en banc, since the panel might solve the problem by amending the opinion. In order to be notified when the panel has acted, an off-panel judge must ask the panel for a 5.4(b) notice, named after our General Order of that number. The 5.4(b) notice, when issued by the panel, informs the full court of the panel's action and triggers the time for any judge still dissatisfied with the opinion to make an en banc call; the call must be made within 14 days of the issuance of the 5.4(b) notice. See G.O. 5.4(b)(2). These are the procedures applicable to all cases and every one of our judges is familiar with them; we use them every day.
 
 
 143
 In this case, an off-panel judge (Judge X) made a request for a 5.4(b) notice on September 27, 1996, and the panel duly issued that notice on January 17, 1997.[1] In that notice, the panel informed the court that it was planning to make some minor changes to the opinion and otherwise to deny the petition. That memo was circulated, as is customary, by way of our internal e-mail system. Again, under our General Orders, if no judge calls for an en banc vote within 14 days of the 5.4(b) notice, the suggestion for rehearing en banc is deemed rejected and the panel is free to file an order to that effect. Adding 14 days to January 17 brings us to January 31; no en banc call was made as of that date. In an abundance of caution, the author of the opinion inquired of the judge charged with coordinating the en banc process and was advised that January 31 was, indeed, the last date to make an en banc call. Over a month later, on March 6, the order denying rehearing was filed with a revised opinion containing the small amendments mentioned by the panel in its 5.4(b) notice.
 
 
 144
 Six days later, on March 12, another off-panel judge (Judge Y) wrote to the panel asking that it withdraw the order denying rehearing in order to give that judge an opportunity to make an en banc call. The judge in question explained as follows the failure to make a timely call:
 
 
 145
 I ... attempted to determine why I had not become aware of your decision earlier. The answer appears to be that my chambers systems malfunctioned and the opinion simply fell between the cracks. A partial explanation, but not excuse, is that the disposition was circulated shortly before a law clerk transition and that the old and new law clerks assigned to the case failed to communicate.
 
 
 146
 The following day, March 13, Judge X, who had originally requested the 5.4(b) notice, seconded the request. Four days after that, Judge X circulated a second memo noting that a timely 5.4(b) request had been made. "Was a 5.4(b) notice circulated? Did I miss it?", inquired Judge X.
 
 
 147
 The author of the opinion responded, noting the mandate had been stayed to allow petitioner to seek certiorari. On the question whether an en banc call could be made, the authoring judge stated as follows:On Monday, March 17, 1997, I sent you copies of papers from my file that demonstrate that you both had adequate notice of the panel's intent to amend the opinion and a 5.4(b) notice. The notice was sent to Associates on January 17, 1997.
 
 
 148
 The memo also noted that "[i]n compliance with our general orders, the en banc coordinator set the date of January 31, 1997 as the last date on which a timely call for en banc could be made" and confirmed that "the panel was under no further obligation to do anything in response to [the] request for a 5.4(b) notice dated September 27, 1996."
 
 
 149
 Neither Judge X nor Judge Y responded by claiming they did not receive the 5.4(b) notice. Neither argued at the time that they should be allowed to make a belated en banc call because of excusable neglect.[2] Neither judge notified the full court that he felt aggrieved by the panel's unwillingness to waive the deadline as a matter of comity. In fact, this whole controversy--the claim that there was some compromise of the court's processes--did not come to the attention of the full court until after the Supreme Court denied certiorari, even though issuance of the mandate was safely stayed that entire time and any adjustment could have been accomplished without the extraordinary step of recalling the mandate.[3]
 
 
 150
 This recitation of events should make clear that there was nothing unusual about what happened in this case. The panel followed our procedures scrupulously; the en banc coordinator made an unremarkable ruling; there was no breakdown of our internal communications system. Two judges made mistakes--precisely the sort of mistakes lawyers make all the time and as to which we routinely hold they do not amount to excusable neglect. See, e.g., Committee for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 824 (9th Cir.1996), ("inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect," quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 392, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993)). At the same time, 35 other judges who were entitled to make an en banc call had reviewed the slip opinion and the suggestion for en banc rehearing and were satisfied that the result did not meet the rigorous standards for en banc review. Small wonder. While the majority now comes to a different conclusion than the three-judge panel, it does not indicate where the panel opinion was in conflict with the law of the circuit, the law of another circuit or the Supreme Court. In fact, the difference between the earlier opinion and this one involves only the application of law to facts, quintessentially the kind of case where en banc review is routinely rejected. Nor is this a case of transcending importance, unless one views every death case as exceptional. While the panel might have been more accommodating to Judges X and Y, the action is not unprecedented, particularly when the request was presented six weeks late and without any compelling reason for the delay.[4]
 
 
 151
 The majority also seems to suggest that Judges X and Y were misled because they were told they could not call for en banc, while the filing of an amended opinion in fact re-opened the period for making an en banc call. Maj. op. at 1049 & n. 2. The short answer is that they were not misled. As the memo from the authoring judge quoted above makes clear, the en banc coordinator's ruling only held that the panel was "under no further obligation to do anything in response to Judge [X]'s request for a 5.4(b) notice dated September 27, 1997." Nothing and no one dissuaded Judges X or Y, or both together, from making a sua sponte en banc call on the basis of the amended opinion. No one addressed the point at all.
 
 
 152
 But maybe Judges X and/or Y were not aware of the possibility they could call for en banc review on the basis of the amended opinion, and were misled by the failure of the panel and the en banc coordinator to offer them this alternative. Not so. Judge X in the memo of March 13, 1997, said as follows: "I wonder whether in any event an amended opinion triggers a new 5.4(b) period." Since this was written only 7 days after the amended opinion had been filed, nothing prevented Judge X, Judge Y or any other judge (we were all copied in on the memo) from seizing this thought and asking for a 5.4(b) notice right there and then. The judge in question would not even have had to be sure that it would work; the request could have been made and the matter "litigated" before the en banc coordinator and the full court. See n. 2 supra. Once again, the Judges Appellant had a full and complete remedy for the supposed breakdown in our processes, but did nothing.
 
 
 153
 Where then is the beef? Where the extraordinary circumstances that empower us to exercise the seldom-used authority to recall the mandate? Where the affront to "the integrity of our processes" the majority complains about? Maj. op. at 1048. It just doesn't exist.
 
 
 154
 But let's assume, contrary to fact, that Judges X and Y were somehow hoodwinked out of their right to make an en banc call. It does not follow that this is something the petitioner can complain about. It has long been established that "[t]he function of en banc hearings is not to review alleged errors for the benefit of losing litigants," United States v. Rosciano, 499 F.2d 173, 174 (7th Cir.1974) (en banc), citing Western Pacific R.R. Corp. v. Western Pacific R.R. Co., 345 U.S. 247, 256-59, 73 S.Ct. 656, 661-62, 97 L.Ed. 986 (1953). En banc review, rather, is a means for a multi-judge court that sits in panels of less than the entire number to bring consistency within its law. See Western Pacific R.R., 345 U.S. at 260 n. 20, 73 S.Ct. at 663 n. 20. Thus, the majority commits egregious error when it suggests that en banc review is "a part of the full and fair procedure our court affords in connection with initial habeas petitions." Maj. op. at 1049. A cursory review of the most elemental authorities on this point discloses this is just not so. The statute which grants power to the court to sit en banc gives the parties no rights whatsoever to require en banc rehearing, or even a consideration by the full court of the suggestion. See, e.g., Western Pacific R.R., passim; Notes of Advisory Committee on Appellate Rules following Fed. R. App. P. 35 ("The provision that a vote will not be taken as a result of the suggestion of the party unless requested by a judge of the court in regular active service or by a judge who was a member of the panel that rendered a decision sought to be reheard is intended to make it clear that a suggestion of a party as such does not require any action by the court.").
 
 
 155
 The implications of this body of law for our case are rather clear. Since the en banc process gives no rights to the parties, a breakdown in the process--even if there was one--creates no problem of extraordinary dimensions. If the en banc call is missed for whatever reason, the error can be corrected in a future case where the problem again manifests itself. Any problem worthy of en banc consideration will perforce appear again and again; missing an en banc call in a single case does not terminate forever the opportunity of judges troubled by the error to raise the issue. Thus, even were I to accept the majority's premises that something untoward happened here, I cannot see how this supports the extraordinary remedy of recalling the mandate.
 
 
 156
 That this is a capital case does not change the calculus. The stakes are higher in a death case, to be sure, but the stakes for a particular litigant play no legitimate role in the en banc process. Nor can we say that "death is different" and therefore that it is appropriate to impose more layers of procedural safeguards. The Supreme Court has already imposed quite a few layers of additional safeguards with respect to death cases. There is no indication anywhere in the Court's opinions that we are free to add to these safeguards by imposing an especially rigorous en banc review process. Indeed given that 28 U.S.C. § 46(c) and the 1967 Federal Rules of Appellate Procedure Amendments all were promulgated prior to Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), it would seem quite strange to extract from them special procedures peculiarly applicable to death cases.
 
 
 157
 Ultimately, then, the majority's decision to recall the mandate must stand or fall on the other factors it cites in support of its action, such as Thompson's claim of actual innocence, the supposed errors in the panel's decision and the serious consequences to the petitioner. As Judge Hall points out, there are few petitioners who can't make out a colorable claim that some or all of these factors are present, and we will be hard pressed to distinguish them from Thompson's case. See Hall dissent at 1065-66. Given the difficulties imposed in filing second habeas petitions under AEDPA, we can expect a flood of requests to "recall the mandate".
 
 II
 
 158
 While I would not reach the merits of the first habeas petition, I comment briefly on the portion of Judge Fletcher's opinion dealing with prosecutorial misconduct. Fletcher op. Part III. Because that portion of the opinion does not command a majority, it is more in the nature of ruminations by some of our judges. See also Tashima concurrence. As I find this issue troubling, I contribute a few random thoughts of my own.
 
 
 159
 To begin with, I do not agree with Judge Fletcher's broad statement that "it is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." Fletcher op. at 1058. There is, in fact, a long line of cases that says, if only by way of dicta, that judicial estoppel will not apply against the government in criminal cases. See, e.g., Nichols v. Scott, 69 F.3d 1255, 1272 (5th Cir.1995); United States v. McCaskey, 9 F.3d 368, 378 (5th Cir.1993); United States v. Kattar, 840 F.2d 118, 129-30 n. 7 (1st Cir.1988) (all noting that judicial estoppel has never been applied against the government in a criminal case). The matter is thus far from settled, much less "well established."
 
 
 160
 That said, there is surely something troubling about having the same sovereign, particularly acting through the same prosecutor, urge upon two juries a conviction of both A and B, when it is clear that the crime was committed by either A or B. To begin with, it raises the suspicion that the prosecutor may have presented testimony he knows, or has reason to believe, is false. If that be the case, the breach in prosecutorial ethics consists of putting on the tainted testimony, not in pursuing the inconsistent verdicts. But it is impossible to make judgments about what the prosecutor knew or should have known at our level, as Judge Tashima points out. See Tashima concurrence at 1064; but cf. Fletcher op. at 1056 (finding prosecutor's characterization of testimony "patently untrue"). Thus, if the petitioner makes a prima facie case that the prosecutor knowingly presented false evidence, the matter must be resolved at an evidentiary hearing.
 
 
 161
 But, as Judge Kleinfeld points out, prosecutors are not omniscient. See Kleinfeld dissent at 1074-75. They may be confronted with witnesses who present mutually inconsistent versions of what happened, and there may be no way of knowing which version--if any--is true. Is the prosecutor then precluded from presenting either case to the jury? Must he pick one based on his intuition? I believe not. A prosecutor, like any other lawyer, is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment. After all, the guarantee of due process encompasses a fair trial before a fair judge and jury; the right to a lawyer and to exculpatory evidence available to the prosecution; and the right not to have the prosecutor lie to the jury. But I cannot see that it encompasses the right to have a prosecutor who is convinced of the defendant's guilt. We trust the adversary process, the good sense of jurors, the presumption of innocence and the prosecution's heavy burden of proof to ensure a verdict that is fair to the defendant. If the system works as it should, A and B both may be acquitted, but in no event should more than one of them be convicted.
 
 
 162
 Must we be troubled, however, where the process does not work well--where both A and B get convicted, despite the best efforts of everyone involved? I believe so. If A and B cannot both be guilty, we then know that one innocent person has been convicted. Whether this rises to the level of a due process violation is close to the question the Supreme Court posed in Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993): Is there a federal constitutional right not just to fair process, but also to a correct result? While the Supreme Court has not yet answered this question, the better view seems to be that the state has no right to execute an innocent man, however fairly it has obtained the conviction. In the case of mutually inconsistent verdicts, which I am not sure is the case here, I believe that the state is required to take the necessary steps to set aside or modify at least one of the verdicts. While the authority for this position is far from ironclad, it is nonetheless compelling.
 
 
 163
 I start with Durley v. Mayo, 351 U.S. 277, 76 S.Ct. 806, 100 L.Ed. 1178 (1956), where the Court granted certiorari to determine whether due process was offended by a conviction which was alleged to rest on perjured testimony, but the prosecutor had not been aware of the perjury at trial. The Court dismissed for lack of jurisdiction, but four Justices (Douglas, J., joined by Warren, C.J. and Black and Clark, JJ.) would have held that it is a denial of due process for the state to retain a conviction it later discovers was based on perjury. The Second Circuit in Sanders v. Sullivan, 863 F.2d 218 (2d Cir.1988) (Kaufman, J.) took the same view.
 
 
 164
 Writing for himself and Justice Ginsburg, Justice Stevens relied on Durley in arguing that a stay should be granted in Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995). (Justice Breyer would also have issued a stay.) Jacobs had been convicted of capital murder, and the state had then tried and convicted Jacobs's sister, based on Jacobs's own testimony. At the sister's trial, the prosecutor had argued that he now believed Jacobs had told the truth and it was the sister who killed the victim. Nevertheless, Texas insisted on executing Jacobs, and eventually did. Justice Stevens's dissent argues, like Judge Fletcher here, that the prosecutor committed misconduct at trial in presenting inconsistent theories. The facts in Jacobs are more compelling than in our case, but they raise the same basic issues. Whether or not one agrees with Justice Stevens and the judges joining Part III of Judge Fletcher's opinion that the prosecutor committed misconduct at trial by pressing inconsistent theories, it still seems mighty troubling for the state to take a prisoner's life after having publicly announced that it believes him to be innocent. I, however, would treat it as a denial of substantive due process rather than prosecutorial misconduct.
 
 
 165
 Which brings me to a final thought: Whatever the Supreme Court ultimately decides due process requires, it is unseemly for the state to act as it did in Jacobs and, perhaps, in our case as well. Whether or not the United States Constitution allows them to argue inconsistent theories to different juries, it surely does not inspire public confidence in our criminal justice system for prosecutors to leave themselves open to charges of manipulation. The danger is particularly grave in capital cases, where the manipulation could well cause the execution of an innocent person. That is a calamity none of us should contemplate lightly.
 
 
 166
 KLEINFELD, Circuit Judge, with whom T.G. NELSON, Circuit Judge, joins, dissenting:
 
 
 167
 I join fully in Judge Hall's dissent. I write separately because I think it necessary to comment upon the merits of the case, in view of the reasons stated in majority opinion. I write with some trepidation, because the last-minute aspect of this proceeding prevents me from mastering the record. Though death penalty cases are typically litigated for more than a decade, as this one has been, we are always presented with critical decisions to make in a procedural context that prevents us from knowing the record as well as in routine cases. For this reason, Congress and the Supreme Court have rightly seen last-minuteness as an obstacle to truth and justice.
 
 
 168
 Thompson raped a twenty year old woman, Ginger Fleischli, and then stabbed her five times in the head. When one of his thrusts of his knife penetrated 2 1/2 inches through her ear, it killed her. Then he and his roommate, David Leitch, carefully wrapped her up and threw her body away. People v. Thompson, 45 Cal.3d 86, 246 Cal.Rptr. 245, 753 P.2d 37 (1988). The people of California have decided to implement a death penalty, and they have the right to do that under the Constitution. A jury which, unlike the members of this court, heard and saw the testimony and other evidence, concluded that Thompson raped and murdered Ginger Fleischli, and that he should be executed for it. The majority concludes that the jury was wrong, the prosecutor was unethical, the defense lawyer was incompetent, the trial judge failed to protect Thompson from all this, and the three judge panel of this court was blind to the injustice of it all. Today's majority therefore thwarts the duly arrived at sentence even though the judges who disagreed with our panel failed to follow the rules to bring the matter before us in a proper and timely way.
 
 
 169
 If I agreed with the majority that Thompson was innocent, then the standard for recall of a mandate, "an overpowering sense of fairness and a firm belief that this is an exceptional case requiring recall of the mandate in order to prevent an injustice," would apply. Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir.1996). No one will ever get my vote to execute an innocent man because a judge or a lawyer missed a deadline. But there is no persuasive reason to doubt that Thompson had a fair trial, and that the jury had good reason to conclude that he raped and killed Ginger Fleischli. I am unable to share the majority's contempt for all the participants in that trial except Thompson.
 
 
 170
 There are three propositions critical to the majority opinion: (1) the evidence that Thompson raped Ms. Fleischli was negligible except for the jailhouse informants' testimony; (2) Thompson's lawyer did a terrible job of showing that Thompson did not rape Ms. Fleischli and that the jailhouse informants should not be believed; (3) the prosecutor violated the Constitution in Thompson's case by telling the jury in the Leitch case, a considerable time later, a different theory he then had of how the crimes were committed. Not one of these three propositions has a sturdy enough foundation to support the procedurally extraordinary action we take today.
 
 
 171
 If this jury was like most I have seen, it would not have convicted a man based on the word of a couple of criminals in jail. Here are eight other reasons (I am sure the jury had more, because it, unlike us, saw and listened to Thompson testify, and heard and saw all the other evidence) why the jury could reasonably have concluded that Thompson raped Ms. Fleischli before he murdered her.
 
 
 172
 1. Ms. Fleischli had sex with someone--there was semen in her body.
 
 
 173
 2. Ms. Fleischli's blouse and bra were cut and pulled down her arms, suggesting that the sex was against her will, that the person who had sex with her meant to keep her from using her arms and hands to interfere, and that the person having sex with her was aggressive with a knife. The majority suggests that the restraint was more likely connected with the murder than the rape, but I see no reason why jurors could not have thought Thompson restrained Ms. Fleischli's arms the better to rape her.
 
 
 174
 3. Thompson admitted he had sex with Ms. Fleischli, but claimed she consented.[1]
 
 
 175
 4. Thompson was carrying handcuffs when he was arrested in Cabo San Lucas, Mexico, suggesting that his modus operandi for committing crimes was to immobilize the victim's arms.
 
 
 176
 5. Ms. Fleischli was murdered by Thompson, a fate more frequent among rape victims than friendly sex partners.
 
 
 177
 6. Ms. Fleischli's bruises suggested handcuff injury and violence used to compel her to do something against her will.
 
 
 178
 7. Ms. Fleischli may have douched or washed after sex. The majority thinks this shows the sex was consensual, but a jury could have inferred the opposite, that if a rape victim persuaded the perpetrator to let her go to the bathroom, she would wash the crime away from the inside and outside of her body as best she could, in whatever time she had.
 
 
 179
 8. Thompson lied, at first denying that he had sex with Ms. Fleischli, and then claiming he had consensual sex with her. His testimony was full of lies presented with extraordinary effrontery.[2]
 
 
 180
 None of the nine listed matters depend on the jailhouse informants the majority thinks could have been impeached better. The majority's suggestion that without the jailhouse informants, the evidence could not have sustained a rape conviction, is an insult to the jury.
 
 
 181
 I do not think the majority's attack on defense counsel is fair. Thompson was sentenced to death because he raped and murdered Ginger Fleischli, not because he had a bad lawyer. The only really disastrous event for the defense that could have been avoided was Thompson's testimony. Thompson personally, by talking to the jury, probably persuaded them that he was a liar, and would not lie if the truth would set him free. Fortunately (from the viewpoint of the truth-seeking purpose of a trial) Thompson insisted on testifying, against his lawyer's strenuous advice, so the jury got to see and hear him.
 
 
 182
 Thompson's lawyer got the state's own pathologist to admit to the jury that "[t]here is no anatomical evidence of rape. There is nothing to indicate it whatsoever." He also got the state's pathologist to admit that vaginal tearing or bruising was common in rape, yet absent here. That is about as good as it gets, for expert testimony in a rape case. The majority thinks defense counsel should have called his own witness to gild the lily. Most good trial lawyers avoid calling their own experts when they get what they need from the other side's witness, because the jury is more likely to believe the evidence from the mouth of someone not hired and paid to say it. Had Thompson's lawyer put on his own expert and had his expert been impeached, then the jury might well have disregarded both of them, and Thompson would have lost the benefit of the state pathologist's admissions.
 
 
 183
 The majority also thinks defense counsel should have hammered more on what liars the jailhouse informants probably were. Most good trial lawyers would let the jury draw its own conclusion after hearing, as they did, that the informants had multiple felonies, heroin use, used language suggesting they had read their information in the newspaper, obtained special favors, gave inconsistent stories, and perhaps were paid off by Leitch's family. The three judge panel does not decide whether counsel was ineffective, because there was no prejudice. I see no reason to disagree with that, but suggest also that the case for ineffectiveness has not been made.
 
 
 184
 The other ground stated in the majority opinion[3] is that the prosecutor urged one theory for how and why Ms. Fleischli was murdered in Thompson's trial, and a different one in Leitch's trial some time later. We, not prosecutors, are supposed to adhere to stare decisis. That is because equal justice for all requires that we decide like cases alike. Prosecutors are not bound by the principle of stare decisis, because they do not decide cases. A prosecutor cannot present evidence or a case he knows to be false. But there is no reason to think the prosecutor knew either theory he presented was false, when he presented it or at any time.
 
 
 185
 Thompson, Leitch, and Ms. Fleischli were all in the tiny apartment the night Ms. Fleischli was raped and murdered. The prosecutor was not. The only way the prosecutor could find out what happened was to ask the surviving liars, consider the physical evidence, and think about what made sense. The majority opinion claims that "it is well established" that a prosecutor cannot offer inconsistent theories in successive trials, but its own authority shows that the proposition is not "established" at all. In Haynes v. Cupp, 827 F.2d 435 (9th Cir.1987), we affirmed despite a claim of inconsistent prosecution theories. We said the theories were consistent, so we did not have to consider whether it would have mattered, had they been inconsistent. In the majority's other case for the supposedly "well established" principle that prosecutors must stick with the first theory they came up with, only one judge, concurring in a 12 judge en banc, said so, and that was in "the peculiar facts of this case," not generally. Drake v. Kemp, 762 F.2d 1449, 1479 (11th Cir.1985) (Clark, J., concurring). The majority makes up a novel principle, cites no good authority for it, and claims incorrectly that the principle is "well established."
 
 
 186
 There is no reason why the prosecutor's change of theory at a later time should be treated as a due process violation.[4] The standard boilerplate instruction tells juries that "arguments of counsel are not evidence." Devitt & Blackmar, Federal Jury Practice and Instructions § 12.03; Ninth Circuit Manual of Model Jury Instructions--Criminal § 3.05. The jury is supposed to decide the case based on the evidence and the judge's instructions. The lawyers offer the jury theories to help them make sense of the evidence. But the twelve jurors often have more diverse and extensive experience in life than the lawyers, and make better sense of the evidence than the lawyers. The lawyers were not at the scene of the crime, and can only, like the jurors, draw inferences. It is up to the jury, not the prosecutor, to decide what happened amidst a lot of lies.
 
 
 187
 The majority rightly says that the prosecutor must seek above all to do justice, but seems confused about what justice is. The duty to do justice in no way conflicted the duty to seek Thompson's conviction, because there is absolutely nothing in the record to suggest that the prosecutor knew or thought that Thompson was innocent. If, as the jury reasonably concluded, Thompson raped Ginger Fleischli and then stabbed her to death through the ear, then the cause of justice coincided exactly with convicting him. Ginger Fleischli was entitled to justice--life and the liberty not to be raped, and conviction and punishment of the man who took these rights away from her.
 
 
 
 [1]
 Thompson also filed a Rule 60(b) motion in the district court that was denied by the district court. He has appealed the denial to our court. We dismiss that appeal, which is now moot, in a separate order
 
 
 [2]
 But see G.O. § 5.4.c. (3), which provides that any judge may sua sponte call for an en banc vote within 21 days after the filing of a disposition or amended disposition. (Emphasis added)
 
 
 [3]
 As we have emphasized in the text, supra, our recall of the mandate is not predicated on any new evidence or claims Thompson raises in his motion to recall the mandate
 
 
 [4]
 The district court found Brower's explanations not credible and criticized both his performance at trial and his deposition testimony at the habeas hearing
 
 
 [5]
 The State also called two jailhouse informants, who testified that Thompson had admitted to raping Fleischli. As we discuss infra, Brower also was ineffective for failing to impeach these informants, whose testimony was patently unreliable
 
 
 [6]
 There also was evidence that Fleischli's blouse and bra had been cut up the middle and pulled down to her elbows. Viewed with the evidence that Fleischli's jeans were on, zipped, and belted, this more likely suggests that the restraint was connected to the murder than that it evidenced a rape
 
 
 [7]
 Vogel testified, for example, that Thompson had told him that Fleischli had been "a little tipsy," but that "[h]e didn't rape her."
 
 
 [8]
 According to the prosecution, Leitch's desire to reconcile with his ex-wife was motivated by the fact that she had recently come into a substantial sum of money as the result of a personal injury settlement
 
 
 [9]
 Henceforth, when we refer to "the prosecutor," we mean Jacobs
 
 
 [10]
 In fact, Fink had made his testimony available to the State before the joint preliminary hearing. The state elected not to call him at that stage, but rather chose to rely on other informants who told very different stories
 
 
 [11]
 The American Bar Association also recognizes the special place of prosecutors in our constitutional system. "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict." ABA Model Code of Prof. Responsibility EC 7-13 (1981); see also ABA Standards for Criminal Justice § 3-5.8(c)(d) (2d ed.1981) (prosecutor has responsibility to guard rights of accused and those of society)
 
 
 [12]
 Given that a prosecutor may not "knowingly" introduce false testimony, we disagree with the district court's decision to read, but to declare "irrelevant," the prosecutor's deposition testimony taken for this federal habeas proceeding. We think that the prosecutor's knowledge and beliefs, before and after Thompson's trial, regarding this crime are entirely probative of whether the prosecutor presented at the trial a theory and set of facts that he knew contradicted the theory and facts that he planned to advance, and eventually advanced, at Leitch's trial
 
 
 [1]
 Alex Kozinski, Tinkering With Death: A Death-Penalty Judge Reflects: How Does It Feel To Send Another Man To Die?, New Yorker, Feb. 10, 1997, at 48
 
 
 [2]
 I describe the facts as one might have described them conservatively at the time of the vote by the en banc court to recall the mandate. The fact is that the case could well be stated far more strongly. By the time the en banc court voted on the question of recalling the mandate it had already heard full argument on the merits and knew that it would be required to reverse the death-eligible conviction if the mandate were recalled. We not only had taken the "peek under the rug" described in the majority opinion, but we had heard and reviewed everything that was hidden under the rug. In short, we knew that we were being asked to recall the mandate, not, as Judge Kozinski suggests, in a case involving a "colorable" claim, but in a case in which we already knew that a capital defendant did not receive effective counsel on the charge that made him death-penalty eligible and had been deprived of due process of law as a result of prosecutorial misconduct. We also knew that if we failed to recall the mandate he would be executed without ever having received a fair chance for a full review in this court, notwithstanding that the evidence against him on the death-eligible charge was insubstantial
 
 
 [3]
 Selective quotations from internal memoranda can be highly misleading. Even the quotation of a full internal communication may give a false impression under some circumstances. The reader might be surprised to read, for example, the contents of a communication from Judge K in this case, if I were uncollegial enough to include it in this opinion
 
 
 [1]
 The majority's "finding" would also seem to require the prosecutor on Thompson's retrial to pursue the same theory he pursued at Leitch's trial. I am reluctant to impose this limitation on the prosecution, absent a finding on the issue
 
 
 [2]
 Another way of viewing the issue is that without that finding, one cannot conclude which defendant, Thompson or Leitch (or perhaps both), was deprived of due process
 
 
 [1]
 Despite the majority's disclaimer of this "evidence" as grounds for their decision to recall the mandate, Thompson's motion is based solely on those grounds. It is that motion--filed by Thompson--which reflects his intent to end run the AEDPA. It was the denial of that motion which triggered this court's vote on whether to recall the mandate. See note 3, infra
 
 
 [2]
 The district court denied that motion on July 25, 1997, correctly holding that the Rule 60(b) motion was to be treated as a successive petition for habeas corpus. Clark v. Lewis, 1 F.3d 814, 825 (9th Cir.1993); see also Felker v. Turpin, 101 F.3d 657, 661 (11th Cir.1996); Blair v. Armontrout, 976 F.2d 1130, 1134 (8th Cir.1992); Kyles v. Whitley, 5 F.3d 806, 808 (5th Cir.1993), rev'd on other grounds, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The court then concluded that it lacked jurisdiction to consider Thompson's motion because he had not received prior authorization in this court to file a successive habeas petition, as required by § 2244(b)(3) of the AEDPA
 
 
 [3]
 Nor could the en banc court decide sua sponte to recall the mandate. This court only has jurisdiction to rehear en banc "an appeal or other proceeding." F.R.App. P. 35(a). Absent a successful or failed motion to recall our mandate, there is no "appeal or other proceeding" to rehear
 
 
 [4]
 When a party has suggested rehearing en banc, the General Orders for a sua sponte call do not apply. See G.O. 5.4.c. (1)(a) ("Any judge may request a vote on rehearing a case en banc: (1) sua sponte; (2) in response to a panel's rejection of a judge's proposal for amendment (see G.O. 5.3, supra ); or (3) in response to a party's suggestion or a panel's recommendation that a suggestion be rejected (see G.O. 5.4. (b)(2), supra ).") (emphasis added)
 
 
 [5]
 "Any active judge may request that the court vote to suspend a provision or provisions of these orders.... Any proposed suspension must be approved by the number of votes that equals or exceeds two-thirds of the eligible judges." G.O. 11.11
 
 
 [1]
 I regret having to delve into internal court communications, especially as I do not believe any of this matters at all. See pp. 1069-70 infra. However, as the majority has opened the door by giving what I see as an inaccurate description of what happened, I feel constrained to set the record straight. I believe this is especially appropriate since the parties do not have access to these facts and thus have no way of challenging or defending the majority's assertions
 
 
 [2]
 While our General Orders provide time limits for taking certain actions, including the making of an en banc call, they are not self-executing. A judge who disagrees with the application of the General Orders can challenge the action and, ultimately, put the matter to a vote of the whole court. In this case, nothing precluded Judges X or Y from calling for en banc late. Had such a call been made, it would have been up to the en banc coordinator to determine whether it was timely; the en banc coordinator has traditionally exercised authority to waive certain time limits for excusable neglect and the like. Had the en banc coordinator ruled the call untimely, the aggrieved judges would have had two remedies: They could have appealed the ruling to the full court, arguing for a waiver on the basis of excusable neglect or collegiality or whatever, or they could have asked for a suspension of the rules pursuant to G.O. 11.11. The latter might have been harder than the former, but they could have done either or both. They did neither
 
 
 [3]
 Judge Reinhardt purports to dispute my account of what transpired. He is mistaken. As I state in the text, the full court was notified in March that Judges X and Y had missed the deadline. See p. 1069 infra ("Since [Judge X's memo] was written only 7 days after the amended opinion was filed, nothing prevented Judge X, Judge Y or any other judge (we were all copied in on the memo) ....") (emphasis added). What no one knew until July is that Judges X or Y thought this reflected some "procedural misunderstandings" or that "our en banc process did not function in the intended manner." Maj. op. at 1048. Indeed, in his memo of March 12, Judge Y takes the entirely contrary position: "At this point all I can do is ask whether the panel might be willing to recall the mandate to permit me to make a prompt though belated call. Under our rules, the decision is clearly yours." (emphasis added)
 Judge Reinhardt also seems to dispute my assertion that the full court was not notified of the controversy until after the Supreme court denied certiorari. He says: "In addition, before our mandate was spread in the district court, two other judges also requested that a belated en banc call be entertained. Again, the entire court was notified immediately." Reinhardt concurrence at p. 1060. Here is what happened:
 June 2, 1997 Supreme Court denies certiorari.
 June 11, 1997 Ninth Circuit issues mandate.
 July 7, 1997 Judge Z calls for belated en banc.
 Judge Z's memo of July 7, almost a month after the mandate was issued, was the first that the court at large became aware that "there were procedural misunderstandings" or that "our en banc process did not function in the intended manner." Judge Reinhardt's assertion that "the entire court was notified immediately" is contrary to fact.
 
 
 [4]
 The majority's assertion that "there has been no occasion in the past several decades in which this court has made a similar error in any type of case," maj. op. at 1050, is not accurate. It's happened to me more than once
 
 
 [1]
 The new evidence alluded to by the majority and Judge Hall is a defense paralegal's affidavit about her interview of Thompson's roommate Leitch in prison and other consistent material. Leitch told her that he had walked into the entryway of the little apartment around 3:00 AM, saw Thompson having sex with Ms. Fleischli on the floor, and turned around and left. Leitch believed that the sex was consensual. If a jury believed Leitch saw what he claimed, his story would corroborate the proposition that Thompson had sex with Ms. Fleischli. Because Leitch says he turned around and left, not that he stayed in the room and asked Ms. Fleischli how she felt about it, I do not see how his glimpse of two people having sex proves that the woman wanted it
 
 
 [2]
 Governor Wilson's careful decision denying clemency quotes this extraordinary passage:
 Q. Let me clarify Saturday morning, September 12 [the morning after the murder]. Did you, or did you not, say Ginger left with Shawn [Kashani] to Tracy?
 A. I did not, sir.
 Q. Then why did you tell that to [police investigators] Owen and Coder?
 A. Because at that time, as I said before, he [Shawn] seemed as likely a candidate as anybody.
 Q. So you lied about that too?
 A. I did, sir.
 Jurors might have thought that a man who would lie and try to frame a friend, would readily lie about whether he had raped a woman he murdered.
 
 
 [3]
 It may be that less than a majority of our en banc panel agrees to this proposition
 
 
 [4]
 We need not decide whether there could ever be a case in which justice required that the government be estopped from urging inconsistent theories in different cases, cf. Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597 (9th Cir.1996), or whether the government can never be estopped in a criminal case, as the authorities marshalled by Judge Kozinski suggest. Nor need we decide whether due process could ever bar conviction of two people on different theories. There is nothing in the circumstances of this case to support the proposition that the prosecutor's offer of a different theory to the jury in Leitch's substantially later trial creates any bar to Thompson's conviction in the earlier trial